# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**TAZ HARDWOODS COMPANY, INC.,**
**also insured and trading as Tri-County**
**Hardwood, a West Virginia Corporation,**

### Plaintiff,

*vs*.                                             **CIVIL ACTION NO. 2:03CV93**
                                         **(The Honorable Robert E. Maxwell)**

**WESTCHESTER FIRE INSURANCE**
**COMPANY, a Georgia corporation**
**and a subsidiary of ACE USA, Inc.,**

### Defendant.

## OPINION/REPORT AND RECOMMENDATION

This matter is pending before the Court on Defendant's First Motion For Partial Summary Judgment As To Plaintiff's Bad Faith Claims (Counts 2 & 8), filed April 29, 2005 (Docket Entry 47); Defendant's Second Motion For Partial Summary Judgment As To Plaintiff's Extra-Contractual Claims (Counts 3, 5, 6, & 7), filed April 29, 2005 (Docket Entry 49); Defendant's Third Motion For Partial Summary Judgment As To Plaintiff's Breach Of Contract Claims (Counts 1, 4 &9), filed April 29, 2005 (Docket Entry 51); Defendant's Consolidated Statement of Undisputed Material Facts, Appendix and 41 Exhibits; Plaintiff's Response To Motions For Summary Judgment Of Westchester Fire Insurance Company (hereinafter "Westchester") With Motion For Enforcement Of Local Rule (Docket Entry 56), filed May 16, 2005; the affidavits of Dennis Niland, Joyce Bernatowicz, Vincent J. King and Exhibits 42-65; the Reply Brief Of Defendant Westchester Fire Insurance Company In Support Of Three Motions For Partial Summary Judgment (Docket Entry 57), filed May 27, 2005; Taz Hardwoods Company, Inc. (hereinafter "Taz") Sur-Response Memorandum To The Reply Brief Of The Defendant (Docket Entry 61), filed June 6, 2005;

Defendant's Supplemental Filing Of Evidence In Support Of Westchester's Motions For Summary Judgment (Docket Entry 94), filed October 13, 2005; Response In Opposition Re: Supplemental Motion For Summary Judgment Supplemental Filing Of Evidence In Support Of Westchester's Motions For Summary Judgment (Docket Entry 104), filed February 15, 2006; Defendant Westchester Fire Insurance Company's Reply Brief In Support Of Its Motions For Summary Judgment (Docket Entry 105), filed February 28, 2006; and the arguments made during the hearing of September 2, 2005, the same having been continued from August 30, 2005. The matter was taken under consideration for the preparation of this OPINION/REPORT AND RECOMMENDATION.

## Consolidated Statement of Undisputed Material Facts

Upon review of Defendant's Consolidated Statement of Undisputed Material Facts in Support of Its Three Motions for Summary Judgment (Docket Entry 54); Westchester Fire Insurance Company's Appendix of Exhibits In Support of Its Three Motions For Summary Judgment (Docket Entry 53; Supplemental Filing of Evidence in Support of Westchester Fire's Motions For Summary Judgment (Docket Entry 94); Plaintiff's Notice of Intent to Supplement Evidence and Argument in Accordance With The Court's Order of January 17, 2006 (Docket Entry 101); Defendant's Forty-One Separately Tabbed Exhibits filed in support of its three Motions For Summary Judgment; Plaintiff's Twenty-Four Separately Tabbed Exhibits filed in opposition to the Motions For Summary Judgment and all other exhibits attached to and filed as a part of the pleadings and memorandums filed in this action, the undersigned finds the following facts are undisputed and material to the issues raised by the pending motions for partial summary judgment:

1)      In March 2000, Taz began operation of its laser sight guided band saw equipment at its Hazelton Mill. (DE 54, Ex 1, Complaint, p. 8).

2)      Westchester  was licensed to conduct business in West Virginia.  (DE 54, Ex 1, Complaint, p. 4).

3)      January 17, 2001 Westchester issued a policy of insurance, including FPA 671 035 covering Taz's sawmill operations in Preston County, West Virginia.  (DE 54, Ex 1, Complaint, p. 3).

4)      On October 25, 2001, fire partially destroyed Taz's Hazelton Mill.  (DE 54, Ex 1, Complaint, p. 6).

5)      On October 26, 2001, Westchester retained William L. McElveen (hereinafter "McElveen"), an independent property adjuster with prior experience in adjusting sawmill and other forest product industry property losses, as its adjuster with respect to the Taz fire loss.  (DE 54, Ex 2,  McElveen Affidavit, pp. 2 and 6).

6)      On October 27, 2001, Taz retained National Fire Adjustment Company (hereinafter "NFA") as its public adjustor.  (DE 54, Ex 3).

7)      McElveen visited the Taz fire scene on October 29, 2001.  (DE 53, Ex 2,  McElveen Affidavit, p. 6).

8)      On October 31, 2001, NFA requested a $250,000 advance against payments.  (DE 54, Ex 2, McElveen Affidavit, p. 7).

9)      On November 11, 2001, McElveen requested Westchester issue the $250,000 advance.

10)     By November 15, 2001, advance payment of $250,000 had been made under FPA 671 035 to Taz as requested by NFA.  (DE 54, Ex 2,  McElveen Affidavit, p. 9 and Ex.4).

11)     On December 7, 2001, NFA sent McElveen a proposed lease of a temporary mill operation located at "Kingwood Pike."  (DE 54, Ex 2,  McElveen Affidavit, p. 10).

12)     NFA requested a $500,000 general advance on December 7, 2001 which was paid to Taz on

December 20, 2001. (DE 54, Ex 2, McElveen Affidavit, p.12 and Ex 5).

13) NFA provided documentation to McElveen supporting Taz's property loss claims on December 18, 2001. (DE 54, Ex 2, McElveen Affidavit, p. 11).

14) NFA requested a $750,000 general advance on February 26, 2002, which was paid to Taz on March 8, 2002, making the total advance payments $1,500,000 in the less than five months that intervened since the October 25, 2001, fire. (DE 54, Ex 2, McElveen Affidavit, p. 12 and Ex 6).

15) On May 3, 2002, McElveen wrote Dennis Niland of NFA suggesting building and personal property losses of $2,206,810.49, after deductible and depreciation leaving a suggested balance due of $706,810.49, after deduction for the already paid $1,500,000. (DE 54, Ex 2, McElveen Affidavit, p. 14 and Ex 7).

16) On May 22, 2002, Dennis A. Neas, C.P.A., (hereinafter "Neas") wrote NFA requesting records relating to income loss. (DE 54, Ex 12).

17) On May 29, 2002, Taz filed is Sworn Statement In Proof Of Loss claiming $2,285,192.41 in losses and damages leaving $780,192.41 claimed due after deduction of the deductible and advance payments already made. (DE 54, Ex 8).

18) On June 14, 2002, Taz acknowledged receipt and payment by Westchester of $245,000 as "partial payment of loss by fire to sawmill building, machinery & equipment." The payment was described as "seven (7) months at $25,000 for the sawmill and $10,000 for the equipment." On May 22, 2002, Neas wrote NFA requesting records relating to income loss. (DE 54, Ex 12).

19) On June 4, 2002, Westchester paid Taz $780,192.41. (DE 54, Ex 9).

20)   On August 2, 2002, Neas again wrote NFA requesting specific types of records for specific time frames relating to income loss or, if the records were not available, a telephone call saying the records were not available.  (DE 54, Ex 15).

21)   On August 20, 2002, Taz acknowledged receipt and payment by Westchester of $250,000 "in partial payment of loss by fire to loss of business income."  (DE 54, Ex 16).

22)   On August 27, 2002, NFA wrote McElveen and Neas enclosing a summary schedule of preliminary loss of income and extra expense claim in the amount of $2,852,982; acknowledging partial payments received toward income loss in the total sum of $495,000; and requesting a $1,000,000 advance as soon as possible for Taz "to meet their obligations and stay in business."  (DE 54, Ex 17).

23)   On August 29, 2002, Neas e-mailed Jason@maloneyandassociates.com requesting specific documentation relative to the business loss claim. (DE 54, Ex 18).

24)   On September 12, 2002, Taz acknowledged receipt and payment by Westchester of $500,000 "in partial payment of loss by fire to business income loss associated with sawmill operations" making the total payments to September 12, 2002, of  $995,000.  (DE 54, Ex 19).

25)   On October 1, 2002, NFA wrote to McElveen advising that Taz was requesting another $1,000,000 advance against business income loss of over $2,600,000, of which $945,000 had been paid and arguing that the accountants for Westchester had several weeks to make their own evaluation and Taz was "suffering severe financial hardship as a result of this fire and its impact on its loss of profit."  (DE 54, Ex 20).

26)   On October 7, 2002, NFA sent McElveen a copy of "our detailed business income/extra

expense claim" which NFA had sent to Neas on October 2, 2002. (DE 54, Ex 21).

27) On November 8, 2002, Neas wrote to NFA detailing the reasons why Westchester disagreed with the 1.6 million business income and extra expense loss claim computations of Taz and invited Taz to provide documentation or additional explanations for consideration. (DE 54, Ex 22).

28) On November 14, 2002, Taz filed its sworn statement in proof of loss claiming $2,603,260.18, less payments of $995,000 for a net loss and claim of $1,618,260.18. (DE 54, Ex 23).

29) By letter dated November 19, 2002, the proof of loss was sent to McElveen with a demand for immediate payment of the $1,618,260.18 claim to alleviate financial problems "as a result of the insurance company not making good faith payments." The letter also asks McElveen to "provide a copy of your West Virginia adjusting license, as it appears that you are unfamiliar with the rules and regulations as they apply to West Virginia policyholders by your intentional refusal to make recommendations for good faith payments for losses of income and extra expenses." (DE 54, Ex 24).

30) On December 9, 2002, Westchester gave notice of its intent to consider Taz's sworn statement in proof of loss; to respond thereto; to make additional payments to the extent it had sufficient documentation to support such payments; announced it believed insufficient documentation had been submitted to warrant payment of the $1,608,260.18 claim submitted: and announced its intent to examine under oath persons from Taz who would have knowledge with respect to subjects enumerated in Exhibit A to the letter. (DE 54, Ex 25).

31) On February 3, 2003, during the examination under oath of Jason G. Jenkins, he testified that

Taz's pre-fire loss production reports "were in the mill when it burned" and were not available.   (DE 54, Ex 28 pp. 30-31).

32)     On February 4, 2003, examination under oath of Larry Donald "Pete" Frazee (hereinafter "Frazee") was taken.  Both Taz and Westchester were represented by legal counsel.

33)     Frazee testified that he believed Taz had records available of the pre-fire log input as well as the pre-fire log output of the sawmill, records Westchester had been seeking from Taz since February 21, 2002, and Taz had been reporting had been destroyed by the fire or so water damaged that they were thrown away and were not available.   (DE 54, Ex 25, p. 73) and (DE 53, Ex 31).

34)     On February 4, 2003, during an examination under oath, Belinda S. Landon testified  she prepared summaries (Quarterly Sawmill Cutting Report January to March 2001) from records that were ultimately destroyed in the fire (summaries alluded earlier in the day by Frazee and which had been located and brought to the EUO during a break on February 4, 2003).   (DE 54, Ex 29, p. 4).

35)     On February 24, 2003, counsel for Taz wrote counsel for Westchester as follows: "If the Neas document includes any loss analysis or settlement proposal relating to the close down of operations, the insured will treat such information as being advanced by the insurer in bad faith, and as constituting evidence of the insurer acting with unreasonable delay in analyzing and approving the claim, and in making proper payment thereon."

36)     On March 3, 2003, counsel for Westchester wrote counsel for Taz outlining Westchester's difficulties in obtaining financial data for use in evaluating the loss of income claim and its efforts to obtain that information from Taz.  (DE 54, Ex 26).

37)     By letter dated March 27, 2003, counsel for Westchester demanded binding appraisal under its interpretation of the terms of the insurance policy covering Taz. Counsel also submitted Westchester's "most recent financial analysis from Neas that takes into account the most recent data that was obtained reflecting the actual operations of the mill pre-loss, the temporary mill during the loss period, and post-loss period operations of the mill." (DE 54, Ex 32).

38)     By letter dated April 14, 2003, counsel for Taz proposed "arbitration" with respect to all issues, including coverage issues as opposed to binding appraisal reserving coverage issues. Counsel also disputed Westchester's interpretation that the appraisers were to determine the "value of the property" as opposed to "the amount of Net Income and operating expense or amount of loss." Counsel also demanded Westchester declare the specific coverage issues it was challenging. (DE 54, Ex 33).

39)     By letter dated April 24, 2003, Westchester insisted on binding appraisal and rejected arbitration.

40)     By letter dated May 2, 2003, counsel for Taz acknowledged Westchester's letter of April 24, 2003, and announced Taz would "participate in the appraisal process" and insisted on strict compliance with the terms of the policy with respect to that process. (DE 54, Ex 35).

41)     By written agreement dated July 25, 2003, and prepared by Taz's counsel, Taz and Westchester agreed they disagreed with respect to "the amount of loss of the insured covered under the contract of insurance . . . Including but not limited to Business Income" and "the amount of Net Income and operating expense and the amount of loss" sustained by Taz in the fire under the policy in effect with Westchester; selected appraisers; agreed on an appraisal

procedure and the duties of the appraisers; and that "[a] decision agreed to by any two of the appraisers or umpire of the amount of Net Income and operating expense or amount of loss, will be binding."   (DE 54, Ex 37).

42)   Taz filed the within civil action October 24, 2003.  (DE 54, Ex 1)

43)   An appraisal award was issued on December 11, 2003, in the amount of $1,650,000.00 related to the business income loss portion of the claim.

44)   Westchester paid Taz $655,000.00 on December 19, 2003, representing the balance due on the $1,650,000.00 appraised business income loss portion of the claim after deduction of the $995,000.00 already paid to Taz.  (DE 54, Ex 39).

## Contentions of the Parties

**Defendant – Westchester**

Count 2 – Statutory Bad Faith

1.   Taz fails to identify provisions of the UTPA allegedly violated by Westchester.

2.   Taz fails to assert facts supporting its claims that Westchester violated the UTPA with such frequency as to constitute a general business practice entitling Taz to punitive damages by:

   A.   "Refusing coverage of over $655,000.00 in legitimate and long-standing claims of the insured."

      i.   Business income claim for a large commercial loss is not subject to precise calculation.

      ii.   Calculation of business income claim from a large commercial

loss is subject to differing opinions of accountants.

iii. Taz's failure to promptly provide pre-loss business productions records complicated calculation of pre-loss production costs, an essential element of income loss (sales less costs = income).

iv. Taz's movement of its post loss operations to a leased sawmill (the "Temporary Mill")with equipment that was different and less efficient than the pre-loss mill made calculation of loss of income from the adjustment of post-loss production records difficult (pre-loss gross income less post-loss production costs of temporary mill adjusted = pre-loss net income).

v. "Revisions" or "accounting corrections" made by Taz accountants to the log yard inventory records changed the calculations in the cost of sales for post loss operations making the calculation of income loss by adjusting post loss production costs of the Temporary Mill more difficult.

vi. During the first examination under oath of a Taz witness it was learned for the first time that records containing information with respect to pre-loss production costs were not destroyed in the fire and were available.

B. Not making "payments as if replacement of lost business income on a regular basis to meet the on going expenses of the business as it

struggled to operate...."

      i.     Taz was represented by certified public adjusters from the day after the fire forward.

      ii.    Taz did not file successive partial sworn statements in proof of loss seeking incremental payments on its business loss claim.

      iii.   Westchester made advanced payments of $995,000.00 on business income losses before Taz filed its sworn statement in proof of loss on November 22, 2002.

C.     Withheld payments "in an effort to force the insured to take less than Westchester was legally obligated to pay."

      i.     Westchester made advanced payments of $995,000.00 on business income losses before Taz filed its sworn statement in proof of loss on November 22, 2002.

      ii.    When it became apparent that the accountants for the insurer and insured could not agree on a method or amount of the total business income loss claim, Westchester initiated an appraisal process.

D.     Misrepresenting "conflicting appraisal provisions"" in an attempt to delay payment of Plaintiff's full claim."

      i.     Taz was represented by legal counsel who participated in the negotiation of the appraisal process.

      ii.    Westchester applied the appraisal provision in the policy

which Taz contended applied.

        iii.     Westchester promptly paid the $655,000.00 award determined by the appraisers.

E.     Misrepresenting "[a]dvance payments under the policies . . . as being for all losses covered under the policies, when in reality Westchester planned to leverage settlement of the physical damage loss claim against their liability to pay the full business income loss claim."

        i.     Taz filed its sworn statement in proof of loss for building and business personal property loss on May, 29, 2002, and reflected therein that the $1,500,000.00 already paid by Westchester was to be a credit against the $2,285,192.41 being claimed, leaving a balance due of $780,192.41, which Westchester promptly paid.

        ii.     No advance payment on business income loss was requested by NFA in behalf of Taz until August 27, 2002.

        iii.     The August 27, 2002, request for advance payment of $1,000,000.00 on a claim of $2,852,982.00 was supported only by a "summary schedule of our preliminary Loss of Business Income/Extra Expense claim" without other supporting documentation and no sworn statement in proof of loss.

Count 8 – Common Law Bad Faith

    1.     Taz's "business interruption claim at issue could not be the basis for a

common law bad faith claim, in that it was not a claim for damage to tangible property and was not 'readily susceptible to calculation'"

2.     "Taz did not 'substantially prevail' in recovering its demanded amount through the appraisal of the business interruption claim."

3.     "Taz was not forced to sue Westchester Fire in order to obtain the amounts owed under the Policy for business interruption.

## Count 3 - Outrage

1.     Taz's allegation that: "The acts and omissions of the Defendants, especially in light of the Defendant's knowledge of the absolute need for prompt adjustment of the claim and to completely adjust said claim in a timely fashion, constitutes outrageous conduct, the proximate result of which caused the Plaintiff to incur substantial damages for which the Defendant is liable" fails, under the undisputed facts of this case show:

    A.     Conduct that is "atrocious, utterly intolerable in a civilized community, and so extreme and outrageous as to exceed all possible bounds of decency";

    B.     "[T]hat Westchester Fire acted with the intent to inflict emotional distress";

    C.     "[T]hat Taz suffered emotional distress 'so sever that no reasonable person could be expected to endure it.'"

## Count 5 - Fraud

1.     Taz's allegations that: "88. On October 29, 2002, the Defendant attempted to

settle the insurance claim based upon the assertion that a temporary mill should never have been operated by the Plaintiff, and such statements and representations made in the settlement attempt constitute an effort to fraudulently induce Plaintiff into a settlement for less money the Plaintiff was legally entitled[.]" and "89. The Defendant knew or should have known its agreements and representations prior to October 29, 2002, precluded such attempt, and therefore, this intentional act constitutes fraud on the Plaintiff, for which the Plaintiff is entitled to the recovery of damages" are:

A.      Insufficiently pled.

B.      Factually and legally without merit in that they together with the undisputed facts of this case do not show "by clear and decisive proof that:

      i.      Westchester Fire made material, false representations

      ii.      Upon which Taz justifiably relied; and

      iii.      Which caused Taz damage."

Count 6 - Illegally Adjusting Claims In West Virginia

1.      Taz's allegations that: "91. McElveen Adjustments is not and was not a licensed adjuster within the meaning of West Virginia Code §33-12B-1, et seq., at the time of the fire, or at an time subsequent thereto while operating in West Virginia to adjust the Plaintiff's claims as a representative of the Defendant. 92. The Defendant knew or should have known of the violation of West Virginia insurance adjusters

licensing requirements by McElveen Adjustments, and permitted such illegal activity in violation of West Virginia statutes, and is liable to the Plaintiff for damages arising therefrom" are subject to summary judgment because:

A.     Westchester Fire did not act illegally.

B.     Westchester Fire required McElveen to comply with the administrative procedure of obtaining a non-resident adjustor's license immediately upon notice of his not previously having done so.

C.     Plaintiff suffered no damage from McElveen's failure to comply with the administrative procedure of obtaining a non-resident adjustor's license.

Count 7 - Malice

1.     Taz's allegation of malice as a separate count and cause of action fails because:

A.     There is no separate cause of action for malice in West Virginia.

B.     To the extent malice is a factor or element of Taz's Count 7 claim for punitive damages, it must fail because:

i.     There is no proof Westchester denied or delayed payment of Taz's claim with actual malice, to wit: a "malicious intention to injure or defraud." There is no evidence Westchester "actually knew that the policyholder's claim was proper, but

willfully, maliciously and intentionally denied the claim." *Hayseeds*, 177 W.Va. at 331, 352 S.E.2d at 80-81).

ii.     The existence of a legitimate issue affecting some material aspect of the case (the disputed method of evaluating Taz's loss of income claim) or the failure of Taz to substantially prevail with respect to his claim on the insurance contract precludes a finding of actual malice.

Count 1 - Breach of Contract

1.      The insurance policy called for appraisal is a dispute that arose with respect to valuation of a loss.  A dispute arose with respect to valuation of the loss of income suffered by Taz as a result of the fire.  Westchester called for appraisal.  By separate agreement the loss of income claim was appraised. Westchester paid the appraisal award.  ". . . [T]he amount of sound value and loss is foreclosed so long as the award stands." *Mutual Improvement Co. v. Merchant's & Business Men's Mutual Fire Ins. Co.*, 112 W.Va. 291, 294-295, 164 S.E. 256, 257 (1932).

2.      There was no delay in appraising and paying the amount due and owing under the insurance contract.

Count 4 - Negligence

There is no cognizable  negligent breach of contract claim in West Virginia.

Count 9 - Violation of the Covenant of Good Faith and Fair Dealing

1.      A violation of the covenant of good faith and fair dealing claim does not exist

separate and apart from a common law bad faith claim in a first party insurance case.

2.   Count 9 is subsumed by the common law bad faith claims made in Count 8.

**Plaintiff - Taz**

1.   Westchester led Taz to believe the incremental payments made before June 12, 2002, in the aggregate of $2,285,192.41 were for all of Taz's losses and were not specifically earmarked for property damages, and, therefore, violated West Virginia Code §33-11-4(9)(j) and (m).

2.   Westchester delayed payment of business income losses that started when the logs stopped going through the mill as a result of the fire.

3.   Westchester invoked an Illegal Appraisal Provision.

4.   Westchester violated provisions of the UTPA and those violations constitute prima facie evidence of negligence pursuant to West Virginia Code §55-7-9.

## Discussion

**Summary Judgment**

Summary judgment is appropriate "if there is no genuine issue of material fact." Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  This burden does not require the moving party to show evidence that proves absence of a genuine issue of material fact, but only to point out its absence.  Id.

The burden then shifts to the party opposing the motion. The adverse party may not rest upon mere allegations or denials, Anderson, 477 U.S. at 248, and summary judgment is appropriate if the adverse party fails to show, under Rule 56, the existence of an element essential to that party's case. Celotex, 477 U.S. at 322. A mere scintilla of evidence supporting the case is insufficient. Anderson, 477 U.S. at 252. With regard to the burden on the adverse party, Rule 56(e) provides in part that:

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

"If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure." Syllabus Point 3, Williams v. Precision Coil, Inc., 194 W.Va. 52, 459 S.E.2d 329 (1995).

"Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syllabus Point 2, Williams v. Precision Coil, Inc., 194 W.Va. 52, 459 S.E.2d 329 (1995).

## Count 2 - Statutory Bad Faith

"To maintain private action based upon alleged violations of statute on bad faith failure to settle claims, with regard to settlement of single claim, evidence should establish that conduct constitutes more than single violation of the statute, that violations arise from separate, discrete acts or omissions in claim settlement, and that they arise from habit, custom, usage, or business policy of insurer, so that, viewing conduct as whole, finder of fact is able to conclude that practice is

sufficiently pervasive or sanctioned by insurer that conduct can be considered a general business practice and can be distinguished by fair minds from an isolated event." Dodrill v. Nationwide Mutual Ins. Co., 201 W.Va. 1, 491 S.E.2d 1 (1996).

In Plaintiff's response to Defendant's Motion For Summary Judgment, Plaintiff relies on the 41 exhibits submitted by Defendant and submitted exhibits 42-65 "in support of the true facts of the case." (DE 56 p.3).

Plaintiff argues the following included facts support Plaintiff's claims in total:

1)      "Westchester retained William McElveen of Georgia, to adjust the Plaintiff's claim in West Virginia, and negligently failed to confirm or even inquire whether Mr. McElveen was competent to legally adjust claim in West Virginia." "William McElveen was not properly licensed for insurance claims adjusting in West Virginia, in contravention of West Virginia Code §§ 33-12-4.[1]"

With respect to this assertion, the undersigned finds there is no dispute of fact that:

a)      Westchester hired McElveen on October 26th, the day following the October 25, 2001 fire  to adjust the loss.

b)      When retained by Westchester, McElveen had not paid his licensing fee and obtained a West Virginia license to adjust the loss.

c)      McElveen did not become licensed in West Virginia until December 12, 2002. Affidavit of Vincent J. King, pp.4.

d)      West Virginia Code, Ch. 33, Art. 12B, Section 4 provides: "No person shall in West

---

[1]The Magistrate Judge believes counsel for Plaintiff intended to cite to West Virginia Code §§ 33-12B-4.  West Virginia Code §§ 33-12-4 refers to "brokers" not adjusters.

Virginia act as or hold himself to be an adjuster unless then licensed therefor pursuant to this article."

There is no evidence to support jury consideration of McElveen's failure to obtain a West Virginia adjusting license before he was notified by Plaintiff's counsel of the defect in the context of this bad faith case. There is no evidence to support any conclusion that the failure to have an adjusting license played any role in the alleged payment delays. It is important to note that Plaintiff's adjusters worked with McElveen in adjusting Plaintiff's losses before and after discovery of the licensing defect. No mention of the licensing issue was made by Taz for 13 months post fire (Niland's November 19, 2002 letter to McElveen Ex 24). In short, while McElveen acted as an adjuster without being properly licensed in contravention of law, there is no evidence or reasonable inference from that set of facts that the failure impacted the adjusting process.

2) "Westchester directed Dennis Neas, their consulting accountant, to conform his claim settlement analysis to a speculative scenario where a temporary mill was never operated by the insured, instead of based upon the actual information requested from and supplied by Taz Hardwoods."

a) Plaintiff's counsel makes the above assertion on the strength of the following:

i. Dennis Niland's affidavit (Exhibit 44):

A. August, 2002 Taz and Bernatowicz advise him that Neas wanted to spend 3 days reviewing documents in Bernatowitcz's accounting office in Kingwood, WV but actually only spent 3-4 hours doing so expressing confidence in the accounting systems of Taz.

B. $500,000 payment for Business Income/Extra Expense losses was

made to Taz by Westchester.

C.    October 29, 2002 an adjustment or settlement meeting took place between McElveen, Neas, Collesano, C.P.A. in New York.   Niland states: 32 "At the meeting, NFA exchanged Business Income/Extra Expense settlement proposals with the Westchester representatives, Neas and McElveen.  The Westchester proposal indicated that a) the temporary mill should never have been opened and operated because their analysis showed the loss would have been less than actually incurred, or alternatively b) their analysis of what the costs should have been to operate a temporary mill were less than actually incurred. 33 Both of these settlement proposal totally ignored the copious financial information sent to them at their request after Westchester had consented and agreed to the operation of the temporary mill. Under the Westchester proposals, Neas and McElveen argued that no additional monies were due to Taz under the policy."[2]

D.    Neas told Niland that he pulled the information on which the Westchester cost calculations for the settlement proposals "out of the air."

---

[2] A plain reading of 32 and 33 of the Niland affidavit reflects there were two proposals made, one by Taz and one by Westchester and neither took into account the financial information Taz says it sent to Westchester on the operational costs of the temporary mill.  In the context of the case, a plain reading of 32 and 33 as written leads the undersigned to conclude that Niland does not make any sense.  The undersigned speculates that Niland meant that of the a) and b) sections of the Taz proposal, neither scenario took the financial information into account.  Unfortunately, he did not clearly state the same.

ii.  Ex 54 and 24 point out that Westchester questioned whether the extra expense coverage provision of the policy paid for expenses for the operation of a temporary mill that proved to be less efficient than the destroyed mill because that would increase rather than decrease the business income loss.

The exhibits, read in conjunction with each other, clearly show that there was a difference of opinion between Taz and Westchester's expert representatives as of November 19, 2006 as to how the business loss should be calculated.  What Plaintiff wants the undersigned to read into the exhibits and conduct of the parties is that Westchester's questioning instead of simply accepting the demand of Taz and paying that demand constituted intentional delay and bad faith.

Moreover, as soon as it became apparent that the parties had reached impasse, Westchester called for appraisal.  Much is made of the call for appraisal by Vincent J. King in his affidavit in opposition to the subject motions for summary judgment.  King asserts and gives conclusory opinions that: 1) it was improper for Westchester to unilaterally call for appraisal; 2)  mutuality was required for appraisal; 3) Westchester hid the improperness of its call for appraisal from Taz; 3) Westchester's conduct deprived Taz of jury determinations of it claims.

Commercial Policy CP 00 30 06 95 D provides in pertinent part: 1) Appraisal "If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss."

The commercial policy as issue was not amended by endorsement prior to the fire.  Affidavit of Donna Steadman, pp. 4.

The policy as produced in discovery  inadvertently had an endorsement attached: "West Virginia Changes" which, with respect to appraisal, in pertinent part reads:  "If you and we disagree

on the amount of loss, both parties may, by mutual consent, agree in writing to an appraisal of the loss." Affidavit of Donna Steadman, pp. 5.

West Virginia Code §33-17-2 requires fire policies issued covering property in West virginia conform to the New York standard fire policy, 1943 edition. It further provides that the New York standard fire policy requirement does not apply to multi-line coverage policies provided the policy provisions are at least as favorable to the insured as the applicable portions of the standard fire policy and the provisions have been approved by the insurance commissioner.

July 2000 the insurance commissioner issued informational letter 119-A requiring the appraisal provisions insurers provided in their policies to conform to language included in the letter. The language made mutuality of the decision to submit to appraisal mandatory. The requirement did not apply to policies issued before January 1, 2001. The policy at issue in the within civil action was issued January 17, 2001. However, by informational letter 119-B dated July 2002, the West Virginia insurance commissioner, recognizing that previous informational letters 119 and 119-A appeared to conflict with the requirements of West Virginia Code §33-17-2, directed that fire insurers only include the appraisal language required by the code and that multi-line insurance providers provide the appraisal language required by the code or "language at least as favorable" as required by the code. The language required by West Virginia Code §33-17-2 with respect to appraisal in pertinent part is:

> In case the insured and this Company shall fail to agree as to the actual cash value or the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty days of such demand. ....

The law favoring appraisal recognizes that insurers and those insured may have legitimate differences of opinion with respect to the amount of a loss, particularly when the loss is intangible.

The law provides a quick and favorable method of resolving that dispute without resort to litigation: appraisal. The law and policy language applicable to this case did not require mutuality. Westchester or Taz each could make written demand for appraisal without the acquiescence of the other. In this case, Westchester initiated the process in accord with the policy and statute and demanded appraisal. In addition, Taz agreed to the appraisal. Even if the statute did not authorize appraisal, the agreement to appraisal renders the whole issue moot.

As will be pointed out in other sections of this Report and Recommendation, the whole negotiation process was ongoing long before Taz finally tendered its sworn statement in proof of business income and extra expense loss as required by the policy. It is significant that throughout the period following the fire through the payment of the appraised loss, Taz was represented by a number of accountants and an adjusting company. At least by April or May, 2002, the accountants and adjusters were joined by Taz's current counsel. Until the sworn statement in proof of the business income and extra business expense loss was filed November 14, 2002, no periodic or incremental statements in proof of loss were filed by Taz. In spite of that, it is undisputed fact that Westchester paid or advanced $995,000.00 against the yet unmade business loss claim.

Once it became apparent from the ongoing negotiations, the discovery seeking previously requested financial data through examinations under oath of Taz witnesses and principles, the inability of the accountants for both parties to reach consensus on the amount of the business loss, Westchester called for the much maligned appraisal.

The appraisal was paid by Westchester within 8 or 9 days of the announcement of the appraised amount by the appraisers.

Finally, as will be more specifically noted in other portions of this Report and

Recommendation, there is no evidence save Taz's *ipse dixit* that Taz was misled by any failure of Westchester to label its cumulative 1,500,000.00 payments for tangible personal property.

There simply is no factual support for the bald allegations of statutory bad faith made by Plaintiff except for the self serving and conclusory statements of its "expert" - Vincent J. King made in response to the motions for summary judgment.

**Count Eight - Common Law Bad Faith**

Count Eight of Plaintiff's complaint alleges Westchester violated its duty of good faith and fair dealing entitling Plaintiff to damages.

This type of action was first recognized in West Virginia in Hayseeds, Inc. v. State Farm Fire & Casualty, 177 W.Va. 323, 352 S.E.2d 73 (W.Va. 1986):   1. Whenever a policyholder substantially prevails in a property damage suit against its insurer, the insurer is liable for: (1) the insured's reasonable attorneys' fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement, and damages for aggravation and inconvenience.   2. An insurer cannot be held liable for punitive damages by its refusal to pay on an insured's property damage claim unless such refusal is accompanied by a malicious intention to injure or defraud."

In a series of decisions that followed Hayseeds, the West Virginia Court limited the application of Hayseeds to situations where the insurer allegedly failed to pay the amount of the loss to tangible personal property that was readily susceptible to calculation.  Thomas v. State Farm Mutual Auto ins. Co., 181 W.Va. 604, 607, 383 S.E.2d 786, 789 (1989) (first party insured's claim involving motor vehicle damages under a collision insurance policy-The critical language in Hayseeds refers to "a policyholder [who] substantially prevails in a property damage suit against its insurer." Syllabus Point 1, in part. In property damage claims, the loss is tangible and the amount of

damages is ordinarily readily susceptible to calculation. *See* Checker Leasing, Inc. v. Sorbello, 181 W.Va. 199, 382 S.E.2d 36 (1989). Because a property damage claim is fixed and calculable, there is little danger that the insurer will be exposed to excessive damages.); Richardson v. Ky Nat'l Ins. Co., 607 S.E.2d 793, 802 (W.Va. 2004) (first party claim for policy proceeds arising from fire that destroyed insured household personal property).

The West Virginia Supreme Court of Appeals clearly stated in Richardson, *supra*:

The Court in Hayseeds explicitly adopted a rule whereby, if a policyholder must sue his or her own insurance company to enforce an insurance contract, and the policyholder substantially prevails in the claim, the insurance company is liable for the payment of the "policyholder's reasonable attorneys' fees." 177 W.Va. at 329, 352 S.E.2d at 80.[FN6] Justice Neely suggested the following rough formula for calculating a "reasonable" fee:

> FN6. In the later case of Miller v. Fluharty, 201 W.Va. 685, 698, 500 S.E.2d 310, 323 (1997) we made it clear that "[o]ur cases do not require a policyholder to prove a particular form of 'bad' conduct by an insurance carrier" to recover consequential damages under Hayseeds. "Our 'bright-line' standard is clear: once a demand is unmet by an insurance carrier, a policyholder need only prove he or she has substantially prevailed." *Id.*

The undersigned has not found a case where the West Virginia Court has applied this rule to a business income loss case. To the contrary, the Fourth Circuit Court of Appeals in explaining the difference between common law bad faith actions under Hayseeds, inc. v. State Farm Fire & Casualty, 177 W.Va. 323, 352 S.E.2d 73 (W.Va. 1986) and Statutory Bad Faith Claims in West Virginia with respect to the ability to recover damages when the insured did not substantially prevail on the underlying claim, stated: "However, *Hayseeds,* by its own terms, applies only to disputes involving claims for *property damage.* Although Maher filed a claim with Continental for damage to the furniture store's structure and contents, neither the legitimacy nor the amount of that claim has ever been in dispute. Rather, the focus in the underlying litigation has been on Maher's separate claim

under the policy for the lost income resulting from the partial shutdown of his business. Because the underlying claim at issue is not one for property damage, <u>Hayseeds</u> and its progeny are inapposite."

Plaintiff's argument that "<u>Maher</u> was based on a situation where the insured had an 'utter lack of' economic data" is contrary to a plain reading of the above quoted language from the Courts opinion.

There is no factual dispute that the instant dispute revolves around valuation of the business income loss sustained by Taz as a result of the fire destroying a modern saw mill and the resulting cessation of business production and the interim operations of a temporary mill. There is no dispute that the parties each engaged consulting accountants who disagreed with each other with respect to the methodology to be used in valuing the loss and the end result value of that business income loss. Business income loss, intangible property such as is presented by the instant case is not readily susceptible to calculation like repairs to a car or other tangible property.

The undersigned is unwilling to extend <u>Hayseeds</u> beyond the expressed applications to which the Courts already have. Accordingly, it is not necessary to address whether or not the Plaintiff substantially prevailed.

For the foregoing reasons, it is the undersigned's **RECOMMENDATION** that Defendant's First Motion For Partial Summary Judgment as to Plaintiff's <u>Hayseeds</u> claims asserted in Count Eight: Common Law Bad Faith (Docket Entry 47) be **GRANTED**.

**Count Three - Outrage**

In response to Defendant's Interrogatory 14 seeking the basis for Plaintiff's claims of Outrage, Plaintiff stated:

> The business interruption insurance coverage offered by Westchester Fire and purchased by Taz Hardwoods contemplated payments by the Defendant to the Plaintiff of business income interruption and loss to preserve and maintain the

Plaintiff's business operations while recovering from a devastating fire which completely closed its mill. [1] The illegally unlicensed insurance adjuster employed by the Defendant and who met with the Plaintiff and its representatives as the primary contact of Westchester Fire made representations that any payments forthcoming to the Defendant were inclusive of business income interruption loss and of property loss claims. This was a lie **and constituted the beginning of continuing outrageous conduct** by the illegally unlicensed adjuster and of the Defendant. [2] When Westchester Fire for the first time in June 2002 told Taz Hardwoods that all coverage payments for the Date of Loss to [sic] would be attributed to property loss only, such treatment constitutes outrageous conduct. [3] That Westchester Fire required the production of business and financial records (unrelated to property loss claims) from the insured for periods arising prior to June 2002, on the stated basis they were necessary to make business income interruption payments, was outrageous, misleading and fraudulent when and because Westchester Fire alone at that time knew it was not making business income interruption loss payments. [4] Westchester Fire's outrageous, misleading and fraudulent basis for the demand of business and financial records, which the insured identified as draft and preliminary, were then subsequently and improperly identified as a basis to deny properly due and owing payments for business income interruption losses, and which remain fully unpaid to date. [5] It is outrageous conduct for Westchester Fire to assert that a small number of pages of handwritten notes constitute a defense of any kind to the proper adjustment and timely payment of the Plaintiff's business income interruption losses, especially when those notes support and increase the loss claim of Taz Hardwoods. [6] It is outrageous conduct that Westchester Fire failed to make adequate reserves for payment of the Taz Hardwoods losses and therefore, resisted payments of the legitimate claims of Taz Hardwoods based not upon good cause, but only on Westchester Fire's own business interest. [7] It is outrageous conduct that Westchester Fire insisted upon an appraisal process which was flawed because of the ambiguous illegal and inconsistent policy provisions. [8] It is outrageous that Westchester Fire directed and/or permitted its claim adjustment accounting representative to sabotage settlement efforts by the insured's accountants by purposely misconstruing portions of a settlement analysis as opposed to achieving a comprehensive settlement of the claim as the Plaintiff intended. [9] It is outrageous conduct that Westchester Fire corrupted the effort toward a fair appraisal process, upon the demand of the use of an ambiguous, illegal and inconsistent appraisal provisions, by revealing to its selected appraiser and to the umpire the existence of the pending law suit by the insured. Such revelations by Westchester Fire to Joseph Eudy and Jack D'Amico is outrageous and violated Westchester Fire's obligation of good faith and fair dealing with its insured under the policy of insurance. [10] It was outrageous that Westchester Fire identified pending litigation to Joseph Eudy and Jack D'Amico with Westchester Fire's view that the insured was litigious and was impatient with the appraisal process in which Messers. Eudy and D/Amico had yet to undertake. [11] It was outrageous conduct that in late 2002, the Pike Mill operation having been approved by the Defendant for operation, that the Defendant's representatives, including the illegally unlicensed adjuster of

Westchester, would make a comprehensive claim settlement offer based upon the premise that the Pike Mill should never have been operated.

The West Virginia Supreme Court of Appeals recognized the tort of outrage in  Harless v. First Nat. Bank in Fairmont, *supra*, and defined the same and the Court's gatekeeper roll with respect to claims made under it in Alcon Laboratories, Inc., 202 W.Va. 369, 504 S.E.2d 419 (1998) as follows:

> "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Syllabus Point 6**,** Harless v. First Nat. Bank in Fairmont, 169 W.Va. 673, 289 S.E.2d 692 (1982)**.**
> 3. In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.
> 4. In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, **the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Whether conduct may reasonably be considered outrageous is a legal question**, and whether conduct is in fact outrageous is a question for jury determination.

The following outline of the undisputed events from the record with respect to the two basic claims arising from the fire is in order:

**Tangible Building and Personal Property Loss**

1) October 25, 2001, fire partially destroyed Taz's Hazelton Mill.
2) October 26, 2001, Westchester retained McElveen, as its independent property adjuster.
3) October 27, 2001, Taz retained NFA as its public adjustor.

4)     October 31, 2001, NFA requested a $250,000 advance.

5)     November 15, 2001, Westchester paid Taz $250,000.

6)     December 7, 2001, NFA sent McElveen a proposed lease of the temporary mill.

7)     December 7, 2001 NFA requested a $500,000 advance.

8)     December 18, 2001. NFA provided documentation supporting Taz's property loss claims.

9)     December 20, 2001 Westchester paid Taz $500,000.

10)    February 26, 2002 NFA requested a $750,000 advance.

11)    March 8, 2002  Westchester paid Taz $750,000.

12)    May 29, 2002 Taz files sworn statement in proof of loss claiming total property damages of $2,285,192.41 less $1,500,000 already paid by Westchester for a net of $780,192.41.

13)    June 4, 2002 Westchester paid Taz $780,192.41 on Building/Personal Property/Equipment.


**Intangible Loss of Income Claim:**

1)     October 25, 2001, fire partially destroyed Taz's Hazelton Mill.
2)     October 26, 2001, Westchester retained McElveen, as its independent property adjuster.
3)     October 27, 2001, Taz retained NFA as its public adjustor.
4)     Taz advises Westchester representatives early in adjustment process that its pre-loss production records were destroyed in the fire.
5)     January 15, 2002 Taz submits its compiled financial statements for 12/31/99 to 12/31/00.
6)     February 6, 2002 Taz submits financial statements to 6/30/01.
7)     May 22, 2006 Westchester writes Taz (Niland) requesting:
       1.     Financial statements to December 2002.
       2.     Monthly production records for 3/2000 through 10/2001.
       3.     Monthly sales records for 3/2000 through 10/2001.
       4.     Monthly financial statements from 1/2002 through loss period.
       5.     Monthly general ledger from 2/2002 through loss period.
       6.     Monthly sales records from 2/2002 through loss period.
       7.     Payroll registers from 2/2002 through loss period.
8)     May 28, 2002 Taz submits its financial statements to 10/25/01.
9)     June 14, 2002 Westchester pays Taz $245,000 for lease of temporary saw mill and equipment for 7 months.
10)    August 2, 2002 Taz submits its financial statements to June, 2002.
11)    August 20, 2002 Westchester pays Taz $250,000 for loss of business income.
12)    August 27, 2002 Taz (Niland) writes Westchester:
       1.     Encloses "summary schedule of our preliminary Loss of Income/Extra Expense claim in the amount of [sic] $2,852.982."
       2.     Insured has only received advances totaling $495,000 to date
       3.     Requests $1,000,000 additional.
       4.     Advises "our final detailed claim will be forwarded after the loss data information

for the Month of August and September have been received and analyzed."

13) September 12, 2002 Westchester pays Taz $500,000 for business income loss.

14) October 1, 2002 Taz (Niland) acknowledges Westchester paid $945,000 on loss of income claim; requests another $1,000,000 advance on claim of $2,600,000+.

15) October 7, 2002 Taz (Niland) submits the detailed Business Income/Extra Expense Claim which had been previously sent on 10/2/02.

16) November 8, 2002 Westchester (Neas) writes Taz (Collesano) asserting difference of 1.6 million dollars in claims made and Neas' calculations and provides explanations and makes inquiries.

17) November 19, 2002, Taz filed its sworn statement in proof of loss claiming $2,603,260.18, less payments of $995,000 for a net loss and claim of $1,618,260.18. Accompanying letter makes assertions of bad faith and, for the first time, demands to see McElveen's West Virginia adjusters licence.

18) December 9, 2002, Westchester gave notice of its intent to consider Taz's sworn statement in proof of loss and announced its intent to examine under oath persons from Taz.

19) February 3, 2003 examination under oath of Jason G. Jenkins who testified that Taz's pre-fire loss production reports "were in the mill when it burned" and were not available.

20) February 4, 2003, examination under oath of Larry Donald "Pete" Frazee who testified that he believed Taz had records available of the pre-fire log input as well as the pre-fire log output of the sawmill.

21) February 4, 2003, during an examination under oath, Belinda S. Landon testified she prepared summaries (Quarterly Sawmill Cutting Report January to March 2001) from records that were ultimately destroyed in the fire.

22) February 4, 2003 summaries alluded to earlier in the day by Frazee were located by Taz personnel and brought to the EUO during a break.

23) February 4, 2003 summaries are the ones Taz had been reporting had been destroyed by the fire or so water damaged that they were thrown away and were not available.

24) March 27, 2003, counsel for Westchester demanded binding appraisal.

25) May 2, 2003, counsel for Taz announced Taz would "participate in the appraisal process."

26) July 25, 2003, Taz and Westchester selected appraisers; agreed on an appraisal procedure and the duties of the appraisers; and that "[a] decision agreed to by any two of the appraisers or umpire of the amount of Net Income and operating expense or amount of loss, will be binding."

27) October 24, 2003 Taz filed the within civil action.

28) December 11, 2003 $1,650,000.00 business income loss appraisal award issued.

29) December 19, 2003 Westchester paid Taz the $655,000.00 balance due on the $1,650,000.00 appraised business income loss.

A review of the above time lines and the documentation submitted with respect to the same

leads the undersigned Magistrate Judge to the conclusion that Defendant's conduct may not

reasonably be considered outrageous.

In every instance, Defendant timely paid the advance and the claim when the same was not in dispute. This is particularly true of the payment of the tangible property claims. Plaintiff complains that the payments were not identified with respect to what coverage the payment was being made under. Plaintiff complains it was misled to believe they were general payments and not property payments. Such complaint ignores the plain fact that Plaintiff filed its May 2, 2002 sworn statement in proof of tangible property loss claiming $2,285,192.41 less the $1,500,000 already paid by Westchester for a net of $780,192.41due. Westchester paid that sum 6 days later. It is disingenuous for Plaintiff to now assert it did not understand what the advance payments had been for and under what coverage of the policy they had been made.

With respect to the intangible business income and extra operating expense claims, at the very beginning Defendant started trying to get information from Plaintiff relative to its pre-loss production and inventory records. For more than a year after the fire, Taz represented the records had been destroyed in the fire. It was not until Defendant commenced examinations under oath of Taz personnel on February 3 and 4, 2003, that it was discovered that the records thought destroyed actually existed and could be produced. In fact, the information thought non-existent was located and produced on the same afternoon of its disclosure during the depositions. Once that information was obtained and analyzed, recognizing that Taz's lawyers and accountants were already accusing it of bad faith and that the parties were unable to come to agreement on the remaining portion of business income and extra expense that may be due over the $945,000 it had already paid, Defendant called for binding appraisal of the loss. Plaintiff agreed to the appraisal and selected an appraiser. Within eight days of the appraisal award, Westchester paid the remainder due to Plaintiff.

Plaintiff challenges the appraisal on two bases: 1) the appraisal procedure had been

invalidated by action of the West Virginia insurance commissioner by the issuance of letters 119 and 119A and 2) the process was tainted by the Defendant having disclosed to its selected appraiser and the independent appraiser that Plaintiff had initiated this lawsuit against it. With respect to the latter argument, Plaintiff has not offered one scintilla of evidence to support its claim that the process was tainted by the disclosure of this public information. However, there is undisputed evidence in the form of the disclosure letter from Westchester's counsel to the appraisal umpire to speed the appraisal process along to avoid further claim of delay. With respect to the first argument, Plaintiff failed to disclose to the Court and Defendant any knowledge that it had that the insurance commissioner had issued a third letter (119B) which had the effect of rescinding 119 and 119A with respect to the appraisal process outlined in the subject Standard Fire Insurance Policy. In short, the commissioner concluded indirectly that Westchester Fire's policy language concerning appraisal was in compliance with the Standard Fire Policy as required by §§33-17-2.

Moreover the negotiations relative to the appraisal process, the reaching of an appraisal agreement, the selection of appraiser and the conduct of the appraisal process was actively participated in by Plaintiff's legal counsel, the same counsel representing Plaintiff in this action.

With respect to Plaintiff's other arguments of outrage, the context is that this was an intangible loss of business income claim. Experts disagreed with respect how the loss should be calculated. Information was slow. Plaintiff did not even file detailed loss claim until approximately a year after the fire. Plaintiff did not file its sworn statement in proof of the business income loss claim until November 19, 2002, more than one year following the fire. Plaintiff's counsel played a role in the delay of the appraisal process.

Moreover, West Virginia has declined to apply the tort of outrage to corporations:

The third part of the appellant's complaint alleges the tort of outrage. This relatively new tort action was first recognized in this State in syl. pt. 6 of Harless v. First National Bank in Fairmont, 169 W.Va. 673, 289 S.E.2d 692 (1982), as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." As the above definition implies, the tort of outrage is not a panacea for all conduct which might be classified as outrageous. The tort only applies where the outrageous conduct causes severe emotional distress to a person. The appellant in this case is Smith Contracting, a corporation. It is difficult for this Court to conceive of how conduct, no matter how outrageous, could inflict severe emotional distress on a corporation. We, therefore, hold that a corporation cannot recover for the tort of outrage or infliction of severe emotional distress. The trial court properly dismissed this count of the appellant's complaint. Chamberlaine & Flowers, Inc. v. Smith Contracting, Inc., 176 W.Va. 39, 42, 341 S.E.2d 414, 417 (1986).

Taz is a corporation and the tort of outrage is inapplicable to it.

Accordingly, for the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** that Defendant's Second Motion For Partial Summary Judgment with respect to Count Three - Outrage (Docket Entry 50) be **GRANTED.**

## Count Five - Fraud

Plaintiff alleges in its complaint:

88. On October 29, 2002, the Defendant attempted to settle the insurance claim based upon the assertion that a temporary mill should never have been operated by the Plaintiff, and such statements and representations made in the settlement attempt constitute an effort to fraudulently induce Plaintiff into a settlement for less money [sic] the Plaintiff was legally entitled.
89. The Defendant knew or should have [sic] know that its agreements and representations prior to October 29, 2002, precluded such attempt, and therefore, this intentional act constitutes fraud on the Plaintiff, for which the Plaintiff is entitled to the recovery of damages.

During discovery, Plaintiff made the following response to Defendant's Interrogatory 14 seeking facts supporting the fraud claim: "Westchester accepted a substantial premium payment from the Plaintiff without the requisite intent to properly perform its contractual obligation under the policy

of insurance." Plaintiff offers no further response or information relative to the fraud allegations in its briefings filed in response to the within motion.

The allegations in Plaintiff's complaint seem to allege that Westchester agreed to the opening of the temporary mill and later, during discussion of the business loss claims, ignoring its prior acquiescence to the temporary mill, suggested a lower settlement based on the inefficiency of the temporary mill. However, Plaintiff's discovery answer suggests the claim of fraud is based on Westchester's accepting substantial insurance premium payments from Taz never intending to carry out its contractual obligations. This latter version of the fraud allegation is inconsistent with the pleaded version. The latter version of the fraud allegation is devoid of factual support in the pleading in violation of F.R.Civ.P. 9(b) which requires: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

> Pleading requirements represent an area of procedural law, however, and are therefore governed by federal law. Tiller v. Hobart Corp., 58 F.Supp.2d 688, 689 (W.D.Va.1999). In Hanna v. Plumer, 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), the Supreme Court held that, in "a situation ··· covered by one of the Federal Rules," a court must apply that rule. Therefore, the Court found that service of process, a situation covered by the Federal Rules of Civil Procedure, is a procedural issue over which federal law has paramount authority. *Id.* at 472, 85 S.Ct. 1136. Likewise, these Federal Rules provide pleading requirements for fraud claims in federal court, and are therefore the governing authority on this issue.
>
> Under the Federal Rules of Civil Procedure, most causes of action need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). "Special matters," such as fraud claims, however, must be "stated with particularity." Fed.R.Civ.P. 9(b) ("Rule 9(b)"). The elements of a fraud claim requiring particularity include " 'the time, place, and contents of the false representations, as well as the identity of the person making the representations and what he obtained thereby.' " *Harrison,* 176 F.3d at 783-84. Also, reasonable detrimental reliance on a misrepresentation is an essential element of a cause of action of fraud, and this detrimental reliance must be pled with *761 particularity. Learning Works, Inc. v. The Learning Annex, Inc., 830 F.2d 541, 547 (4th Cir.1987). Complaints that fail to meet these heightened pleading requirements are subject to

35

dismissal under Fed.R.Civ.P. 12(b)(6). Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 980 (4th Cir.1990).

      A court should hesitate to dismiss a complaint under Rule 9(b) if the court believes that "the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial" and that the "plaintiff has substantial prediscovery evidence of those facts." Harrison, 176 F.3d at 784; *See also* Dunn v. Borta, No. 03-1362, 2004 WL 1110424 (4th Cir. May 19, 2004) (holding that the fraud claims against the defendant should not have been dismissed, as the complaint provided him with fair notice of the claims made against her) and U.S. ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 921-22 (4th Cir.2003) (holding that fraud claims were wrongfully dismissed for insufficient particularity, as they provided sufficient notice of the facts of the alleged misconduct). Garvin v. Southern States Ins. Exch. Co., 329 F.Supp.2d. 756, (N.D.W.Va. 2004).

The requisite identity of the person making the representations and what he obtained thereby is missing from Plaintiff's pleadings and discovery response. Detrimental reliance is hinted at but hardly pleaded with any specificity. To the contrary, with respect to the cost of the temporary mill, any allegation that Taz was somehow misled to its detriment or that Westchester took premiums not intending to not live up to its contractual obligation fails in light of the uncontradicted evidence that on June 14, 2002 Westchester paid Taz $245,000 for lease of temporary saw mill and equipment for 7 months.

For these reasons the undersigned Magistrate Judge **RECOMMENDS** that Defendant's Second Motion For Partial Summary Judgment with respect to Count Five - Fraud (Docket Entry 50) be **GRANTED.**

**Count Six - Illegally Adjusting Claims In West Virginia**

No facts are in dispute. McElveen was not properly licenced in West Virginia to adjust the fire claims in this case from October 26, 2001, when he was retained by Westchester until December 12, 2002, the effective date of his non-resident license card issued by Jane L. Cline, West Virginia Insurance Commissioner.

Adjusting of insurance claims without a state issued license is a violation of West Virginia Code § 33-12B-4: "No person shall in West Virginia act as or hold himself to [sic]to be an adjuster unless then licensed therefor pursuant to this article."

"Violation of a statute is prima facie evidence of negligence. In order to be actionable, such violation must be the proximate cause of the plaintiff's injury." Syl. Pt. 1, <u>Anderson v. Moulder, 183 W.Va. 77, 394 S.E.2d 61 (1990)</u>.

Defendant contends it did not know of McElveen's licensing failure and that Plaintiff has failed to establish any proximate cause between the failure of McElveen to be licensed and any injury or damages allegedly suffered by Plaintiff.

The undersigned agrees plaintiff has failed to establish proximate cause. The time line set forth herein together with the lack of any evidence connecting any damage proximately to McElveen's failure to obtain his West Virginia adjuster's license, leads the undersigned to the conclusion that Plaintiff relies on rank speculation as opposed to evidence.

Based on the total review conducted and the conclusions reached throughout this Report and Recommendation, the undersigned Magistrate Judge **RECOMMENDS** that Defendant's Second Motion For Partial Summary Judgment with respect to Count Six - Illegally Adjusting Claims In West Virginia (Docket Entry 50) be **GRANTED BECAUSE PLAINTIFF IS UNABLE TO ESTABLISH THAT THE FAILURE OF McELVEEN TO BE PROPERLY LICENSED WAS THE PROXIMATE CAUSE OF THAT INJURY**.

**Count Seven - Malice**

Plaintiff alleges:

93 "The Plaintiff incorporates by reference the allegations contained in paragraphs 1-92 of the Complaint as if fully set forth herein verbatim.

94 The actions set forth herein in this count and all preceding counts constitute malice by the Defendant as determined and defined under the laws under the State of West Virginia entitling Plaintiffs to an [sic] awarded of punitive damages against Westchester Insurance."

Defendant correctly contends that there is no independent cause of action for "Malice" in West Virginia. Instead Defendant asserts "malice is a factor which amplifies the seriousness of underlying conduct that creates liability." Transportation Co. V. Standard Oil Co., 50 W.Va. 611, 40 S.E. 591, 593 (1902); Thomas v. Beckley Music and Elec. Co., 146 W.Va. 764, 771 and 773, 123 S.E.2d 73, 77 and 79 (1961).

The language of Count Seven[3] clearly asserts Plaintiff's claim that it is entitled to punitive damages because the conduct of the Defendant in each of the first six counts was allegedly performed with malice.

Defendant argues Plaintiff cannot meet the bright line standard that the claim should have been paid but the insured willfully refused to do so with "malicious intention to injure or defraud." Hayseeds, supra at 331. Defendant again correctly points out that where there is a legitimate issue effecting some material aspect of the case (ie. a bona fide dispute as to the applicable policy limits) there can be no malice. Shamblin v. Nationwide Mut. Ins. Co. 183 W.Va. 585, 592, 396 S.E.2d 766,

---

[3]Inclusion of a separate count to claim malice with respect to acts alleged as claims in other foregoing counts 1-6 is an unorthodox approach to pleading. Usually, if a count alleging conduct as a cause of action supports a claim that the conduct was done out of malice entitling claimant to extra damages (punitive damages), the claim is made as a separate paragraph within the count asserting the claim.

773 (1990).

In the instant case, there is no dispute that there was disagreement on the method of evaluating the business income loss suffered by Plaintiff. There is also no dispute that partial payment of the business loss was made by Defendant notwithstanding there was a dispute over what was the totality of the loss. After a careful review of the totality of the evidence submitted by the parties in support or opposition to the subject motions for summary judgment, there is no evidence to support Plaintiff's claim that any of the alleged conduct of the Defendant was done with malicious intention to injure or defraud.

Accordingly, the undersigned Magistrate Judge **RECOMMENDS** that Defendant's Second Motion For Partial Summary Judgment with respect to Count Seven - Malice (Docket Entry 50) be **GRANTED.**

## Count Nine - Violation Of The Covenant Of Good Faith And Fair Dealing

Count Nine of Plaintiff's Complaint alleges:

99.    "The Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 98 of the Complaint as if fully set forth herein verbatim.

100.    The Defendant has violated the covenant of good faith and fair dealing implied in every business transaction in the State of West Virginia, and has damaged the Plaintiff thereby for which the Plaintiff is entitled to its full recovery."

There is no issue of fact that this is a first party insurance claim between the insured and its insurer. A first party bad faith action is "one where the insured sues his / her own insurer for failing to use good faith in settling a claim ... filed by the insured." State of West Virginia ex rel. Medical Assurance of West Virginia, Inc. v. Recht, 213 W.Va. 457, 471 n. 13, 583 S.E.2d 80, 94 n. 13 (2003).        The West Virginia Court, in Elmore v. State Farm Mut. Auto Ins. Co. , 202 W.Va. 430, 433, 504 S.E.2d 893, 896 (1988) stated: [It] "recognized a common law duty of good faith and fair dealing running from an insurer to its insured, a first-party claimant in a property

damage case, <u>Hayseeds, Inc. v. State Farm Fire & Cas.,</u> 177 W.Va. 323, 352 S.E.2d 73 (1986). We articulated the applicable rule in Syllabus Point 1: Whenever a policyholder substantially prevails in a property damage suit against its insurer, the insurer is liable for: (1) the insured's reasonable attorneys' fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement, and damages for aggravation and inconvenience. This rule is based on the fact that, "when an insured purchases a contract of insurance, he buys insurance-not a lot of vexatious, time-consuming, expensive litigation with his insurer." Hayseeds, 177 W.Va. at 329, 352 S.E.2d at 79. Because a Hayseeds type action is grounded on the existence of a contract between an insurer and its insured and not the insurer's motives in denying a property damage claim, we consider it of little importance whether an insurer contests an insured's claim in good or bad faith. In either case, the insured is out his consequential damages and attorney's fees. To impose upon the insured the cost of compelling his insurer to honor its contractual obligation is effectively to deny him the benefit of his bargain. .... The premise underlying Hayseeds was that the insurer had contractually promised the insured such coverage. Consequently, the insurer had a duty to settle with its insured on a claim for which the insured was legally entitled to recover. If the insurer declined to settle, and the insured was required to sue and then substantially prevailed, the insurer was liable for not just the verdict but also for attorney fees and incidental damages."

There is no issue of fact that Westchester contracted with Taz to provide it with business loss insurance. The facts are not in dispute that Westchester paid the entirety of the property damage loss claims. The facts are not in dispute that Westchester paid $995,000 to Taz for business income loss in advance of its receipt of a sworn statement in proof of loss. The facts are not in dispute that the insurance contract states:

4.      Loss Payment

        g.      We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this coverage part and:

                1.      We have reached agreement with you on the amount of the amount of loss; or

                2.      An appraisal award has been made. (Ex. 40).

The fact is not in dispute that Taz did not supply a sworn statement in proof of loss relating

to its business loss claim until November 14, 2002, when it claimed $2,603,260.18, less payments

of $995,000 for a net loss and claim of $1,618,260.18. (DE 54, Ex 23). Between November 14, 2002

and when Westchester paid Taz $655,000.00 on December 19, 2003, there is no factual dispute that:

1) February 2003, Defendant examined Taz witnesses under oath in accord with provisions of the policy;

2) The depositions resulted in the discovery of financial information predating the fire loss which had previously been thought and reported as destroyed and unavailable.

3) March 2003 negotiations between accountants for both Taz and Westchester relative to the business income loss reached an impasse;

4) March 2003 to June 2003 discussion and dispute between counsel for Westchester and counsel for Taz over appraisal vs arbitration[4] resulting in Taz's May 2 2003 announcement it would participate in appraisal;

5) May to the end of July 2003 continuing discussion between counsel of the terms of the appraisal and appointment of appraisers culminating in the appraisal agreement prepared by Taz's counsel dated July 25, 2003;

6) Appraisal process between the end of July and December 2003;

7) Appraisal award was issued on December 11, 2003, in the amount of $1,650,000.00;

8) December 19, 2003 payment by Westchester to Taz of $655,000.00 representing the balance due on the $1,650,000.00 appraised business income loss portion of the claim after deduction of the $995,000.00 already paid. (DE 54, Ex 39).

The undersigned concludes that the undisputed evidence shows a contract of insurance and

adherence to the requirements of that policy with respect to evaluation of business income loss once

a sworn statement in proof of loss was filed by Taz; examinations under oath to further assist in

evaluating the loss claimed; insistence on appraisal when it became apparent that the accountants

representing the parties were at an impasse; and payment of the appraised loss within a week of the

announcement of that appraisal. It must be noted that Taz controlled when it would submit its sworn

statement in proof of loss. Any delay associated with the later filing of the sworn statement in proof

---

[4]Taz's counsel insisted on binding arbitration by letter dated April 14, 2003.

of loss by Taz, factually lays at the feet of Taz. It must be further noted that while Taz went to great lengths to contest appraisal and insist on arbitration, it ultimately agreed to appraisal. The present claim that it was forced to agree to appraisal and/or was misled with respect to the same, has already been dealt with in this report and recommendation. However, it bears restating, that Taz was represented by the same counsel who now represents it in this action when it agreed to go forward with the appraisal. Taz's counsel must have had good reason for not instituting suit until October 24, 2003, particularly if he knew the March 27, 2003 appraisal requested by Westchester was not required under the policy or the law. Had Westchester agreed to the binding arbitration demanded by Taz's counsel and Taz prevailed in obtaining an award above the amount of loss estimated by Westchester, Taz may then have argued that it had prevailed in an adversarial process in support of a Hayseeds claim.

Notwithstanding the above, this is still an intangible loss claim not heretofore envisioned by the Court as the type of claim covered by Hayseeds. Since the covenant of good faith and fair dealing claim is part of the common law bad faith claim recognized by Hayseeds and its progeny in property tangible property loss claims, the undersigned concludes Count 9 is not viable under the facts of this case and **RECOMMENDS** that Defendant's Third Motion For Partial Summary Judgment with respect to Count Nine - Violation Of The Covenant Of Good Faith And Fair Dealing (Docket Entry 52) be **GRANTED.**

**Count Four - Negligence**

Count Four of Plaintiff's complaint alleges:

84. The [sic]Plaintiffs [sic] corporates by reference the allegations contained within paragraphs 1 through 83 of the Complaint as if fully set forth herein verbatim.

42

85.   Westchester Insurance, by and through its agents, McElveen Adjustments and H.G. Busby by holding themselves out to the Plaintiff to be experienced adjusters and insurance consultants, was fully aware of the requirements of the regulations and the statutes of the State of West Virginia, but negligently performed its duties to the Plaintiff causing direct and consequential damages to the Plaintiff.

86.   The Defendant, in its manner and method of claims handling, was negligent in fairly and promptly adjusting the Plaintiff's claims, and as a result, the Plaintiff has suffered damages for which it is entitled to recovery.

In West Virginia "[t]here is generally no tort liability for nonfeasance, or failing to do what one has contracted to do, in the absence of a duty to act apart from the contract." Chamberlaine & Flowers, Inc. v. Smith Contracting, Inc., 176 W.Va. at 42, 341 S.E.2d at 417.  Explaining the Supreme Court of Appeals, Brotherton, J stated:

In addition to the contract claim, the appellant also asserts a negligence claim. In the second count of its complaint the appellant alleges that, "(D)efendant USF & G negligently adjusted plaintiff's claim and negligently failed to pay to plaintiff the amount to which it was entitled by virtue of the policy of insurance which had been issued to plaintiff by defendant." The appellant, however, is dressing a contract claim in a tort's clothing.

The distinction between tort and contract liability, as between parties to a contract, can be difficult to define. The key distinction is whether the act complained of was one of misfeasance or nonfeasance. Misfeasance, or negligent affirmative conduct, in performing a contract generally subjects the actor to tort liability in addition to contract liability for physical harm to persons and tangible things. *See* Taylor v. Herbold, 94 Idaho 133, 138, 483 P.2d 664, 669 (1971); Prosser & Keeton, *Torts,* p. 656 (5th ed. 1984). On the other hand, there is generally no tort liability for failing to do what one has contracted to do, unless there is some duty to act apart from the contract.[FN3] See Morgan v. South Cent. Bell Tel. Co., 466 So.2d 107, 114 (Ala.1985); Prosser & Keeton, *Torts* 657 (5th ed. 1984). USF & G's refusal to pay on the insurance policy was not a negligent act, but an affirmative refusal to act.[FN4] Such a refusal to act constitutes nonfeasance. Because there is no tort liability for USF & G's nonfeasance in this case, the trial court was correct in dismissing the negligence count of the appellant's complaint.

There is nothing to support fitting Taz's claims of negligence into the exceptions noted in footnote 3 of the Chamberlaine & Flowers opinion.

Accordingly, this being a first party insurance case and there being no independent cause of action in West Virginia for negligence in a breach of contract action, the undersigned **RECOMMENDS** that Defendant's Third Motion For Partial Summary Judgment with respect to Count Four - Negligence (Docket Entry 52) be **GRANTED.**

## Count One - Breach of Contract

For the reasons stated throughout the prior portions of this Report and Recommendation, the undersigned concludes there are no facts to support Plaintiff's claim of breach of contract and accordingly **RECOMMENDS** that Defendant's Third Motion For Partial Summary Judgment with respect to Count One - Breach of Contract (Docket Entry 52) be **GRANTED.**

For docket entry purposes only, Defendant's First Motion For Partial Summary Judgment (Docket Entry 47) is **GRANTED;** Defendant's Second Motion For Partial Summary Judgment (Docket Entry 49) is **GRANTED;** and Defendant's Third Motion For Partial Summary Judgment (Docket Entry 51) is **GRANTED.**

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas

v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 1st day of November, 2006.

/s *John S. Kaull*

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE